[Cite as *State v. Carr*, 2020-Ohio-1523.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

STATE OF OHIO                                    :
                                                 :
        Plaintiff-Appellee                       :        Appellate Case Nos. 27960 and 28080
                                                 :
v.                                               :        Trial Court Case No. 2016-CR-0745/2
                                                 :
BRANDON C. CARR                                  :        (Criminal Appeal from
                                                 :        Common Pleas Court)
        Defendant-Appellant                      :
                                                 :

. . . . . . . . . . .

O P I N I O N

Rendered on the 17th day of April, 2020.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by MICHAEL P. ALLEN, Atty. Reg. No. 0095826, Assistant
Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division,
Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

BRIAN A. MUENCHENBACH, Atty. Reg. No. 0088722, 1900 Kettering Tower, 40 North
Main Street, Dayton, Ohio 45423
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} These consolidated cases are before us on the appeal of Defendant-Appellant, Brandon C. Carr, from his conviction of aggravated murder and other charges related to the death of Brittany Russell. That appeal has been docketed as Montgomery C.A. No. 27960. In Montgomery C.A. No. 28080, Carr appeals from a post-judgment, nunc pro tunc order that corrected a prior order overruling Carr's motion to dismiss the indictment.

{¶ 2} In a single assignment of error that applies to both appeals, Carr contends that he was denied due process when the State failed to preserve evidence and failed to disclose DNA evidence. For the reasons that follow, the assignment of error is without merit. Accordingly, the judgment of the trial court in Case No. 27960 (the judgment of conviction) will be affirmed. The trial court's post-judgment nunc pro tunc order was not a final appealable order. Therefore, the appeal in Case No. 28080 will be dismissed for lack of a final appealable order.

## I. Facts and Course of Proceedings

{¶ 3} In the early morning hours of February 10, 2016, the body of Brittany Russell was found in an automobile in the parking lot at the Twin Manor apartment complex located on Free Pike in Montgomery County, Ohio. At the time, the vehicle was running, and Russell's baby, who was alive, was in a baby-seat in the passenger-side rear seat. Russell had been shot twice in the head. Each shot was fatal.

{¶ 4} According to the evidence, Russell's death arose as a result of events that had occurred the previous day. At the time, Brandon Carr lived in Dayton, Ohio, and Curtis Burdette was engaged in the business of selling drugs in the Middletown, Ohio

area on Carr's behalf. During the time he was selling drugs, Burdette stayed in Middletown off and on, and with various people, one of whom was Russell. In order to replenish his supply of drugs, Burdette drove back to Dayton. When Burdette stayed with Russell, he gave her heroin in exchange for staying there and using her car. Burdette stayed with Russell until December 2015, when he went to live with Russell's next-door neighbor, Carrie. He had the same arrangement with Carrie, giving her drugs to stay at her house.

{¶ 5} Burdette also sold drugs to Tara Jones, who was Russell's friend. On February 9, 2016, Jones called Burdette to get drugs, and he refused. Jones came over anyway, and he sold her some drugs. Two men then came around the side of the house and robbed Burdette at gunpoint. They also forced Burdette inside Carrie's house and took money, drugs, and two cellphones from him. One cell phone was called the "money phone," and was the one people called to buy drugs. The men also took cell phones from Carrie and her fiancée, Paul.

{¶ 6} After the men left, Carrie found another phone, which Burdette used to call Carr to let him know he had been robbed. He also told Carr that he thought Jones and Russell had something to do with the robbery. During the call, Carr was upset and yelling. After Burdette told Carr that he thought Russell and Jones were involved, Carr told him to see if he could get a ride back to Dayton. Carrie and Paul then drove Burdette back to Dayton and dropped him off on the street behind Carr's house; from there, Burdette walked to Carr's house. This procedure was used because Carr did not want people to know where he lived.

{¶ 7} In the meantime, Terry Brachette had taken Carr to the Dayton International

Airport to pick up a rental car, a grey Chevrolet Suburban SUV. After this, they went to a cell phone store, where Carr purchased a cell phone, using the same number as the money phone. Brachette then dropped Carr off at Carr's house. By that time, Burdette had arrived from Middletown. Carr told Burdette to get in the Suburban, and they left. Carr was in the driver's seat and had a gun on his lap. The gun was a .45 caliber, black semi-automatic pistol, with a distinguishing characteristic, which was a safety button on the back of the grip. Carr's uncle, "Duck," was also in the Suburban.

{¶ 8} The three men then drove to Middletown. According to Burdette, he did not know why they were going to Middleton, but when they arrived, Carr said he was looking for Jones and Russell. While Carr, Duck, and Burdette drove around Middletown, Burdette contacted Russell using a phone that Carr gave him. During this time, Burdette had a conversation with Russell that raised his suspicions and made him think Russell may have been involved in the robbery. When Carr heard about this, he was highly upset.

{¶ 9} Eventually, Burdette learned that Russell might be at her sister's house, and Carr drove the Suburban to that location and parked. Russell subsequently left that location with her aunt's boyfriend, Matthew Migda, and drove Migda home. Migda was familiar with Carr, as he had also sold drugs for him.

{¶ 10} During the drive home, Migda noticed a Suburban that appeared to be following them, and told Russell that something was up. Russell's aunt (Rachel Fugate), was aware that Russell was headed to Dayton after dropping Migda off. Based on what Migda had told her, Fugate tried to stop Russell, but Russell left anyway and went to Dayton. Burdette had told Russell why she was supposed to go to Dayton – it was to

pick him up and bring him back to Middletown like they did every day. Burdette told Russell that he needed to get more drugs because he had been robbed.

{¶ 11} When Russell left to go to Dayton, Carr also left Middletown and drove to Dayton. During the trip, Burdette and Russell exchanged text messages. Carr told Burdette where to tell Russell to go, and Russell let Burdette know of her progress. Russell was to go to an apartment on Free Pike where she had been before.

{¶ 12} When Burdette, Duck, and Carr arrived in Dayton, Carr pulled up on Free Pike near the Twin Manor apartments. Carr then walked up the street to Russell's car, which was parked at the back of one of the apartments, and got into the front passenger side of the car. The door had to be opened from the inside because the handle was broken. In order to open the door, Russell had to lean over to the passenger side, pull up a wire, and pop the door open. The door also did not open like a regular door. It opened just a bit when released, and then had to be lifted up.

{¶ 13} At that point, Russell was getting ready to leave, but Burdette had not yet pulled the door all the way shut. He told Russell that he did not have any drugs yet, so they had to wait. He also told her to reposition the car facing the other way, backing into the parking space. Once Russell did that, Carr approached the car on foot and got into the back seat on the driver's side. Carr then shot Russell in the back of the head.

{¶ 14} Burdette did not see the first shot, but when the gun went off, Russell slumped over toward Burdette's side. The front passenger door was still cracked, and Burdette reached for the door to get out. When he was standing by the door, Carr shot Russell again. As noted, both shots were fatal. Carr then got out of the car and said, "Let's go." Transcript of Proceedings ("Tr.") Vol. II, p. 299. Carr stated that people were

not going to keep stealing from him and that he had to set an example. They then walked over to the Suburban, which was parked in an adjacent parking lot in the complex.[1]

{¶ 15} After leaving the apartment complex, the three men drove to Carr's house, where Carr made Burdette change his clothes. They then drove to Carr's father's house on Dearborn Avenue in Dayton, where Carr burned his and Burdette's clothing in an alley behind the house. The men next drove to a lake in the area of Lakeside and South Gettysburg Avenue, where Duck threw the gun in the water.

{¶ 16} After the gun had been tossed into the water, the battery was removed from the phone that had been used to call Carrie and Russell. Carr and Burdette left town the next day, stayed overnight at a motel, and returned the next day (February 12, 2016).

{¶ 17} Beginning on February 10, 2016 (the day the body was found), the police had developed Carr and Burdette as suspects in the murder and went to their known addresses to try to find them. In addition, the police obtained phone numbers for Carr and Burdette and asked the cell carriers to ping both phones. They were not able to locate the phones and did not get any information until February 12, 2016, when the first ping came from Burdette's phone, in Maryland. A series of pings showed the phone moving through Pennsylvania and then Ohio. At about 5:00 p.m. that day, the phone pinged at Brachette's address, and the police arrested Burdette at that location. When Burdette was arrested, he had a small baggie with a quantity of cocaine and two cell phones. After the police obtained a search warrant, they found another phone that had a number associated with Carr and a safe containing heroin.

---

[1] There are two apartment buildings that are adjacent to each other, and each has a parking lot behind, with separate entrances to Free Pike. The lots are separated by a small amount of green space, with a walkway between the lots.

**{¶ 18}** Burdette was questioned by the police after being arrested, but he did not implicate Carr at that time, nor did he admit involvement in the murder. Subsequently, in late March 2016, Burdette made a proffer to the police, implicating Carr. The police then attempted to verify Burdette's account. They found the burned clothing in the alley behind the Dearborn Avenue address, which was also a residence address that Carr had previously given to the police as his address. The police also continued to interview witnesses, viewed video surveillance of Free Pike and the apartment parking lots (which matched Burdette's description of events), and went over multiple phone records, tracking positions of phones based on records. In addition, the police eventually recovered the murder weapon from the lake in September 2016 and matched casings shot from the gun to those found at the crime scene.

**{¶ 19}** After the murder, the police processed the car in which Russell was killed, and then the car was towed to Sandy's Towing. However, when the police contacted Sandy's in February 2017 to have the car moved, they discovered that it had been destroyed.

**{¶ 20}** On March 23, 2017, Carr was indicted on 12 counts: one count of aggravated murder (while committing felony murder), an unclassified felony; one count of murder (purposeful), an unclassified felony; two counts of murder (proximate result), both unclassified felonies; one count of kidnapping (felony or flight), a first-degree felony; one count of kidnapping (terrorize/physical harm), a first-degree felony; one count of felonious assault (deadly weapon), a second-degree felony; one count of felonious assault (serious physical harm), a second-degree felony; two counts of tampering with evidence (alter/destroy), both third-degree felonies; one count of endangering children

(abuse), a first-degree misdemeanor; and one count of having weapons under disability (prior drug conviction), a third-degree felony. The indictment also charged Carr with firearm specifications in connection with the first eight counts.

{¶ 21} In April 2017, a reindictment was filed, adding a charge of possession of heroin in an amount exceeding 50 grams but less than 250 grams, based on the heroin found in the safe at Brachette's house. After Carr pled not guilty, a jury trial was held on several days in late January and early February 2018, after which the jury found him guilty of all offenses and specifications except two firearm specifications. The weapons under disability charge was tried separately to the trial court, which found Carr guilty of that offense as well.

{¶ 22} After merging various offenses, the court sentenced Carr on March 18, 2018, to an aggregate prison term of life without parole, plus an additional 34 years. Carr timely appealed, and the appeal was docketed as Case No. 27960.

{¶ 23} Shortly before trial, on January 16, 2018, Carr moved to dismiss the indictment, but his motion was denied. Carr also filed a motion for reconsideration on January 27, 2018, but that motion was denied as well. Before the judgment entry was filed, the court issued an order to that effect on February 6, 2018. Subsequently, on July 6, 2018, Carr filed a post-judgment motion asking the court to journalize its ruling regarding his motion to reconsider, which the February order had not specifically mentioned.

{¶ 24} On July 12, 2018, the court issued an order granting Carr's motion in part and correcting, nunc pro tunc, two paragraphs of its order denying the motion to dismiss the indictment. Carr appealed from this order as well, and that appeal was docketed as

Case No. 28080. As mentioned, we consolidated the appeals and will address both here.

## II. Due Process

**{¶ 25}** Carr's sole assignment of error states that:

Defendant-Appellant Was Denied Due Process When the State Failed to Preserve Evidence and Failed to Disclose DNA Evidence.

**{¶ 26}** Under this assignment of error, Carr has presented three major issues. We will address these issues separately.

### A. Whether the Indictment Should Have Been Dismissed Because the Destroyed Evidence Was Materially Exculpatory.

**{¶ 27}** As noted, the vehicle in which the murder occurred was destroyed at some point before Carr was indicted in March 2017. Carr's initial argument about the destruction is that the evidence in the car was materially exculpatory because the testimony clearly indicated that a central issue in the case was who pulled the trigger – Carr or Burdette. Specifically, Carr (who testified at trial) claimed he had dropped Burdette off on Free Pike and never was in Russell's car.

**{¶ 28}** In May 2017, Carr filed a motion for a jury view of the car, contending that a jury view would be helpful because of the unusual opening of the front doors (upward rather than outward), and the fact that the video of the scene was grainy. As a result, a view might shed light on what objects appeared in the video. Motion for Jury View, p. 2.[2]

---

[2] Unless otherwise indicated, docket references will be to those filed in Case No. 27960.

The trial court denied the motion in January 2018, because the parties advised the car had been destroyed.  Previously, in September 2017, the court had set a trial date for January 29, 2018.

{¶ 29} On January 16, 2018, Carr filed a motion to dismiss the indictment, stating that:

> The automobile was the site of various evidentiary issues, including, but not limited to, the amount and placement of the victim's blood on the passenger car seat and passenger door.   The defense sought to allow the jury to view this very important evidence to rebut the anticipated testimony of Curtis Burdette ("Burdette") regarding his alleged location in the car during the crime.

Motion to Dismiss Indicted Charges, p. 8.

{¶ 30} In responding to Carr's motion, the State argued that the evidence was not materially exculpatory, commenting that:

> Defendant argues that the destruction of the vehicle prohibits him from taking photographs "from his preferred positions and angles to illuminate his defense[.]"   * * * Further, Defendant argues that the destruction of the vehicle prevents the jury from witnessing the vehicle first hand and observing evidence that cannot be portrayed through photographs.   These arguments fail to establish that the evidence is materially exculpatory.
>
> * * *
>
> Here, the state disclosed to the defense over ninety (90) photographs

depicting the interior and exterior of the victim's car: a Hyundai Elantra compact sedan. Ten (10) of the photographs show the front passenger seat and/or front passenger door completely and in detail. Accordingly, the Defendant is not deprived of any material evidence. Rather he is only prevented from showing his own photographs, which is at best potentially useful and requires a showing of bad faith.

Response to Motion to Dismiss, p. 6.

{¶ 31} At a status conference held on January 22, 2018, the trial court overruled the motion to dismiss, concluding that Carr failed to make a showing that the vehicle evidence would be materially exculpatory. January 22, 2108 Tr. p. 17. The court also held that even if the evidence were potentially useful, there was no showing of any bad faith by the State. *Id.*

{¶ 32} On January 27, 2018, Carr filed a motion asking the court to reconsider its ruling on the dismissal of the indictment. In the motion, Carr argued that he had not received an evidentiary hearing on whether the vehicle was materially exculpatory or on the police's alleged bad faith. During the first day of trial on January 29, 2018, the court addressed the motion for reconsideration. At that time, the court said it would reserve its ruling on the motion until such time as Dayton Police Detective Phillips testified during the defense case. Tr. Vol. I at p. 221.

{¶ 33} After hearing the evidence at trial, the court said it saw no reason to reconsider its prior decision on the motion to dismiss. Tr. Vol. VI, p. 1087 and 1259-1260. The court then filed an entry on February 6, 2018, denying the motion to dismiss. Subsequently, on March 18, 2018, the court filed a judgment entry sentencing Carr to life

without parole and 34 additional years.   Carr then appealed.

{¶ 34} As indicated, after the appeal was filed, Carr filed a pro se motion on July 6, 2018, asking the trial court to journalize its ruling regarding the motion for reconsideration.   The trial court then filed a nunc pro tunc order on July 18, 2018, granting the motion in part and correcting paragraphs one and six of the February 6, 2018 order to correctly reflect the fact that the court was denying the January 16, 2018 motion to dismiss as well as the January 27, 2018 motion for reconsideration.   Nothing of substance was changed from the prior order.

{¶ 35} "Specific tests are applied to determine whether the state's failure to preserve evidence rises to the level of a due process violation.   The test depends on whether the lost or destroyed evidence involves 'material exculpatory evidence' or 'potentially useful evidence.' "   *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 73.   Due process rights are violated when material exculpatory evidence is not preserved.   *Id.* at ¶ 74, citing *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984).   "Evidence is constitutionally material when it possesses 'an exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.' "   *Id.,* quoting *Trombetta* at 489.   The burden of showing the evidence was materially exculpatory is on the defendant.   *Id.* Furthermore, in this situation, the State's bad or good faith is irrelevant.   *Id.* at ¶ 76, citing *Arizona v. Youngblood*, 488 U.S. 51, 57, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988).

{¶ 36} In arguing that the evidence in the destroyed car is material, Carr refers to pages 763-770 of the trial transcript.   Appellant's Brief, p. 9.   This part of the transcript

involves the testimony of Mary Ciccio, a forensic scientist and DNA analyst at Miami Valley Regional Crime Lab. *See* Tr. Vol. IV, p. 756-757. Ciccio compared the known DNA standards of Carr, Burdette, Brachette, and Russell with swabbings collected from the car's interior rear driver's side door and interior front passenger's side door. *Id.* at p. 760-765. According to Ciccio, Russell was the major contributor to the interior driver's side-rear door of the car (where Carr allegedly sat).[3] *Id.* at 765. Ciccio was also able to exclude Burdette, Brachette, and Carr as possible contributors. *Id.*

{¶ 37} Concerning the DNA taken from the front passenger door (where Burdette stated that he sat), Ciccio obtained a mixed DNA profile. She was able to exclude Brachette and Carr, but was not able to exclude Russell and Burdette as contributors. *Id.* at p. 766.

{¶ 38} At trial, Carr testified and admitted obtaining a new cell phone for Burdette and driving Burdette to Middletown the night of the crime. He claimed he had previously been involved in the drug trade, but was no longer involved and was simply doing Burdette a favor. Carr further admitted driving back to Dayton and dropping Burdette off near the Twin Manor apartments. According to Carr, he dropped Burdette off there because he had already passed the direction in which Burdette wanted to go. Carr stated that when he let Burdette off, he assumed Burdette was going to a drive-thru that was across the street from the apartments.

{¶ 39} Carr even admitted pulling into the apartment lot next to the lot where Russell was murdered. His stated reason for doing so was that since he was in the area,

---

[3] Burdette testified that Carr was wearing gloves at the time and that he (Burdette) was not wearing gloves. Tr. Vol. II at p. 305.

he was going to see a friend, Donuts, who lived there. Carr and his uncle sat in the parking lot for several minutes, waiting for Donuts to come out, but he never did, so Carr and his uncle left. Carr further claimed that he never saw Burdette again that night, did not burn any clothes at the Dearborn Avenue house, and did not travel anywhere the following day with Burdette.

{¶ 40} In light of these contentions, the evidence in question was not materially exculpatory. Carr's position was that he was not in the car and that Burdette was the person who shot Russell. From that perspective, the DNA evidence from both the front passenger side and the rear driver's side of the car, where the shots originated, excluded Carr and actually supported his contention that he was not in the car. Carr does not suggest what further processing of the car would have been materially exculpatory.

{¶ 41} Notably, the police took 90 to 100 pictures of the car and thoroughly processed it at the evidence garage, including taking DNA swabs, attempting to lift fingerprints, and collecting hair samples. They even took photos of the headrests. Tr. Vol. III, p. 540.

{¶ 42} The situation here is akin to what occurred in *Powell,* 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865. In that case, a house was the scene of a fire that killed four people. After investigators examined the house and determined that the fire was an arson, the house was found structurally unsound. The city of Toledo then demolished the house shortly before defense counsel filed a motion to preserve and catalog all the physical evidence. *Powell* at ¶ 68-69. In rejecting the defense's due process argument, the court commented that "[n]othing suggests that materially exculpatory evidence was left in the remains of the home following completion of [the fire

investigators'] investigation." *Id.* at ¶ 78. That comment applies here as well.

{¶ 43} For the reasons mentioned, Carr's argument as to the materially exculpatory nature of the evidence is without merit. The next issue for consideration, then, is whether the evidence was "potentially useful" and, if so, whether the State acted in bad faith.

### B. Alleged Bad Faith in Destroying Evidence

{¶ 44} Carr's second contention concerning the destroyed evidence is that:

Should This Court Determine That the Destroyed Evidence Was Only "Potentially Useful," the Trial Court's Decision Should Still Be Reversed in Light of the Bad Faith of the State.

{¶ 45} Concerning this issue, Carr contends that even if the evidence in the car was not materially exculpatory, it was potentially useful. He additionally argues that the police acted in bad faith because they knew they had an obligation to preserve the evidence, but failed to place a hold on the car. After reviewing the record, we find no evidence of bad faith.

{¶ 46} In contrast to the situation we just discussed, " 'the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant.' " *Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, at ¶ 76, quoting *Youngblood*, 488 U.S. at 57, 109 S.Ct. 333, 102 L.Ed.2d 281. In this situation, " 'unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute

a denial of due process of law.' " *Id.*, quoting *Youngblood* at 58. "Potentially useful evidence indicates that the evidence may or may not have incriminated the defendant." *State v. Cox*, 2d Dist. Montgomery No. 25477, 2013-Ohio-4941, ¶ 88.

{¶ 47} " 'The term "bad faith" generally implies something more than bad judgment or negligence.' " *Powell* at ¶ 81, quoting *State v. Tate*, 5th Fairfield Dist. No. 07CA55, 2008-Ohio-3759, ¶ 13. Bad faith " ' "imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud. It also embraces actual intent to mislead or deceive another." ' " *Id.*, quoting *Hoskins v. Aetna Life Ins. Co.*, 6 Ohio St.3d 272, 276, 452 N.E.2d 1315 (1983). (Other citation omitted.)

{¶ 48} According to the evidence at trial, Russell's car was towed to the evidence garage from the scene. Tr. Vol. II at p. 253. This is a pretty normal procedure in situations involving violent crimes. *Id.* As noted, the car was thoroughly processed in the garage. After the car was processed, it was towed to Sandy's Towing. Tr. Vol. IV at p. 682.

{¶ 49} According to Detective House, the procedure for retaining vehicles that are released from the evidence garage varies. When a vehicle is towed for any reason, officers on the street do a tow screen electronically and fill out fields, one of which is to hold the car. *Id.* at p. 681-682. Officers either make their own decision about towing, or, as in this case, "a detective would advise the officer who is doing the tow screen whether or not there should be a hold placed on the vehicle. And a hold just simply says that the vehicle is to be held until it's released by the detective or whatever officers or supervisors are involved in the investigation of that vehicle." *Id.* at p. 682. With an

incident like this one, a hold would normally be placed. However, vehicles involving homicides have been released even before a defendant is charged. *Id.* at p. 683. "Once they've been processed, they're no longer deemed to be needed for evidentiary value; the vehicles have been released." *Id.* at p. 684.

{¶ 50} Detective House has been employed with the Dayton Police Department for 26 years; 18 of those years were as a detective, and five have been as a homicide detective. *Id.* at p. 621. Therefore, he was well-versed in the process.

{¶ 51} At some point after the car was towed, Sandy's contacted the Dayton Police Department Auto Recovery Unit and was informed that it was an abandoned vehicle. Tr. Vol. IV at p. 651. The Recovery Unit, which is manned by civilians, mistakenly listed the car as having been abandoned. *Id.* The police department did not learn of this until February 2017, when it contacted Sandy's to have the car moved. *Id.*

{¶ 52} Detective House noted that in this case, the car was the crime scene. He further commented that if Russell had been shot in an alley or parking lot, or a building, the scene would have been secured until it was processed, and then released; the scene would not be held until the case was settled. *Id.* at p. 152. Detective Phillips, who also testified, indicated that he was not aware until after the fact that the car had been salvaged. He stressed that the car had been thoroughly processed. Tr. Vol. V, p. 935-937.

{¶ 53} These circumstances do not indicate bad faith under any of the definitions mentioned above. The most that could be said is the police may have been negligent. That simply is not sufficient to find a violation of due process warranting dismissal.

{¶ 54} The Supreme Court of the United States has also said that "[w]hatever duty

the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense." *Trombetta*, 467 U.S. at 488, 104 S.Ct. 2528, 2534, 81 L.Ed.2d 413.   We have also found, based on the overwhelming evidence of the defendant's guilt, that no reasonable probability existed that he would have been found guilty if the evidence in question had been obtained.   *State v. Smith*, 2d Dist. Montgomery No. 28207, 2019-Ohio-4373, ¶ 40.

{¶ 55} Having reviewed the record thoroughly, we find that the evidence of Carr's guilt was overwhelming.   Burdette's direct testimony was corroborated on many points by video and cellular evidence, as well as the testimony of others.   Video, while grainy, also showed two persons who approached the car.   First, one person went along the passenger side of the car; his silhouette did not appear above the top of the car.   After the car backed out and then was repositioned (as Carr indicated), another taller person came along the rear driver's side of the car, and his head was higher than the vehicle. The video was not clear enough that people could actually be seen entering the vehicle. According to Detective House, Carr was 6'2" and Burdette was 5'8".   Tr. Vol. IV at p. 666-670.   This is consistent with Burdette's testimony that he entered the front passenger side and Carr entered the rear driver's side.   Subsequently, the video shows two people walking away from the car.   *Id.* at p. 670.   From then until the next morning, when the property manager approached and discovered Russell, no one else approached the car. *Id.* at p. 664.

{¶ 56} In addition, Carr placed himself close to the scene of the crime.   However, Carr's explanation of why he dropped Burdette off and what followed next – that he coincidentally sat in an adjacent parking lot for several minutes, intending to visit a friend,

and then left ‒ was simply not believable.

{¶ 57} Accordingly, there is no basis for finding a due process violation on either ground that Carr claims.


### III.   Prosecutorial Misconduct

{¶ 58} Carr's third issue in support of his assignment of error is that:

The Denial of Due Process Through Destruction of the Evidence

Was Further Exacerbated by Prosecutorial Misconduct

{¶ 59} Regarding this issue, Carr contends that the State committed prosecutorial misconduct by failing to notify him or his counsel of the destruction of the car.   According to Carr, this undermined his ability to adequately defend.   He further notes that nothing in the record indicates that the State affirmatively disclosed the destruction of the car. Alternatively, Carr asserts that the State violated Crim.R. 16(B)(1)(f) by failing to disclose the car's exculpatory nature.[4]

{¶ 60} "The test for prosecutorial misconduct is whether remarks [or prosecutors' actions] were improper and, if so, whether they prejudicially affected substantial rights of the accused."   *State v. Jones*, 90 Ohio St.3d 403, 420, 739 N.E.2d 300 (2000), citing *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984).   "The touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.' "   *Id.,* quoting

---

[4] In his brief, Carr referred to the exculpatory nature of the "tape."   Appellant's Brief at p. 12.   We assume this is a typographical error and that Carr meant to refer to the car, which is the evidence in question.   In addition, under July 2010 amendments to Crim.R. 16, the provision in question is now contained in Crim.R. 16(B)(5).   No change in the interpretation of this part of the rule has occurred, i.e., it is still considered to refer to *Brady* disclosures.   *E.g., State v. Jones*, 1st Dist. Hamilton No. C-180091, 2019-Ohio-4862, ¶ 64.

*Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

{¶ 61} In *Smith*, the Supreme Court of the United States noted that both *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), were past decisions of the court demonstrating "that the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith* at 219.

{¶ 62} *Brady* involved the State's suppression of a confession of a co-defendant, and the court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady* at 87. "Evidence is material if there is a ' "reasonable probability" ' that the result of the trial would have been different had the evidence been disclosed to the defense." *State v. Osie*, 140 Ohio St.3d 131, 2014-Ohio-2966, 16 N.E.3d 588, ¶ 153, quoting *Kyles v. Whitley*, 514 U.S. 419, 433, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). (Other citation omitted.) "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *State v. Johnston*, 39 Ohio St.3d 48, 529 N.E.2d 898 (1988), paragraph five of the syllabus.

{¶ 63} "*Brady* imposes on the government an obligation to turn over evidence that is both favorable to the defendant and material to guilt or punishment. 'Materiality pertains to the issue of guilt or innocence, and not to the defendant's ability to prepare for trial.' " *Osie* at ¶ 154, quoting *United States v. Bencs*, 28 F.3d 555, 560 (6th Cir.1994). (Other citation omitted.) " 'Thus, *Brady* generally does not apply to delayed disclosure

of exculpatory information, but only to a complete failure to disclose.' " *Id*. at ¶ 155, quoting *United States v. Patrick*, 965 F.2d 1390, 1400 (6th Cir.1992), *vacated and remanded on other grounds sub nom. Mohwish v. United States*, 507 U.S. 956, 113 S.Ct. 1378, 122 L.Ed.2d 754 (1993).

{¶ 64} The defense has the burden of proving "a *Brady* violation rising to the level of denial of due process." *State v. Iacona*, 93 Ohio St.3d 83, 92, 752 N.E.2d 937 (2001), citing *State v. Jackson*, 57 Ohio St.3d 29, 33, 565 N.E.2d 549, 555 (1991). (Other citation omitted.) In the case before us, this burden clearly was not met, as there was not a complete failure to disclose. Even if this were otherwise, there is no evidence that the State failed to disclose the destruction of the car, nor is there any evidence indicating exactly when the prosecutors either learned about it or informed Carr's counsel. When the court overruled the motion for a jury view of the car on January 19, 2018, it remarked that the parties had "previously advised" it that the car had been destroyed. Order Denying Motion for Jury View, p. 1. However, when that occurred is not apparent. The motion to dismiss the indictment, filed on January 16, 2018, also does not provide a time-frame for when the defense learned about the car.

{¶ 65} Furthermore, for the reasons previously discussed, the evidence was not material, and there is no reasonable probability that the trial's result would have been different if the destruction had been disclosed.

{¶ 66} As indicated, Carr also presented an alternative argument under Crim.R. 16(B)(1)(f) [now Crim.R. 16(B)(5)]. However, as Carr concedes, Ohio courts have concluded that a prosecutor's duty under this rule is consistent with the *Brady* obligations. *See State v. Keene*, 81 Ohio St.3d 646, 650, 693 N.E.2d 246 (1998) ("the terms

'favorable' and 'material' in Crim.R. 16(B)(1)(f) have the same meaning as they do in *Brady* and its progeny"); *Disciplinary Counsel v. Kellogg-Martin*, 124 Ohio St.3d 415, 2010-Ohio-282, 923 N.E.2d 125, ¶ 24; *State v. Today's Bookstore, Inc.*, 86 Ohio App.3d 810, 820, 621 N.E.2d 1283 (2d Dist.1993) (Crim.R. 16(B)(1)(f) "is intended to fulfill the due process requirements enunciated in *Brady* * * *"). In view of these points, Carr's argument under Crim.R. 16(B) is also without merit.

## IV. Failure to Timely Disclose Evidence

{¶ 67} Carr's final argument is as follows:

> The Trial Court Erred When It Denied Mr. Carr's Motion to Dismiss Due to the State's Failure to Timely Disclose Evidence, and Mr. Carr Was Denied Due Process as a Result.

{¶ 68} This argument is based on the State's failure to submit DNA submission 015 until two days before trial (the Friday before trial began on Monday). According to Carr, the trial court erred by failing to determine whether the State's failure was calculated or willful. Carr further contends that he should have been given the chance to submit this DNA sample to multiple experts of his own choosing.

{¶ 69} In *Iacona*, the Supreme Court of Ohio commented that "[s]trictly speaking, *Brady* is not violated when disclosure occurs during trial, even when disclosure surprises the defendant with previously undisclosed evidence." *Iacona*, 93 Ohio St.3d at 100, 752 N.E.2d 937. "In such a circumstance a trial court has authority, pursuant to Crim.R. 16(E)(3), to grant a continuance or make other orders that the court deems just to ensure that the recently disclosed information can be evaluated, and used at defense counsel's

option, before the trial is concluded." *Id.*

**{¶ 70}** The court then said that "[i]t has, however, been held that the philosophical underpinnings of *Brady* support the conclusion that even disclosure of potentially exculpatory evidence during trial may constitute a due process violation if the late timing of the disclosure significantly impairs the fairness of the trial. Even where information may be exculpatory, '[n]o due process violation occurs as long as *Brady* material is disclosed to a defendant in time for its effective use at trial.' " *Id.*, quoting *United States v. Smith Grading & Paving, Inc.,* 760 F.2d 527, 532 (4th Cir.1985).

**{¶ 71}** The DNA issue was discussed at pages 221-224 of Tr. Vol. I. On the Saturday before trial, Carr had filed a motion in limine concerning a DNA report (Submission 015), which purportedly showed Carr's DNA on a baggie of heroin that was at issue in the case. *Id.* at p. 221-222.[5] In discussing the issue, the court commented that this report from Miami Valley Regional Crime Lab "was not produced to Mr. Carter, despite motions that he had filed on the subject, and that it had not been produced before last Friday, as I understand it. And I think it's pretty clear to the Court and to everybody else that the failure to produce that report earlier was an oversight of the Miami Valley Crime Lab which is not a division of the Prosecutor's office, and the fact that it wasn't earlier produced was through no fault of State's counsel but was entirely through oversight by the crime lab." *Id.* at p. 222.

**{¶ 72}** The court further noted that upon learning of the oversight, the prosecutor saw that Submission 015 was provided to defense counsel at 10:30 a.m. on Friday, and

---

[5] This did not relate to the murder charges or any related charges. Instead, it involved the heroin possession charge, which was based on drugs found in the safe at Brachette's house on February 12, 2016.

defense counsel had then given the submission to its own lab, which had said on Friday that its analysis would take a few hours. *Id.* Defense counsel did not disagree with the court's statements. Counsel did express concern that he wanted a chance to discuss the results with his lab to prepare him for cross-examination of the State's DNA expert (Ciccio). *Id.* at p. 222-223. Defense counsel and the court agreed that counsel could meet with the lab on Wednesday morning during the court's docket call, when trial would not be ongoing. The trial court also told defense counsel to let it know if he had any problems, and the court would immediately call the lab or take other steps so that counsel could meet with his own lab and be able to effectively cross-examine Ciccio. *Id.* at p. 223-224.

{¶ 73} Subsequently, defense counsel cross-examined Ciccio and did not object to the procedure that was used. At the close of evidence, Carr again raised the issue of the late DNA submission. However, the court stated that counsel had an opportunity to review the submission with his lab in order to cross-examine the State's DNA witness, and the court, therefore, saw no reason to change its ruling. Tr. Vol. VI, p. 1260-1261.

{¶ 74} As a preliminary point, the DNA evidence was hardly exculpatory. Instead, it indicated that Burdette, Brachette, and Russell could be excluded as contributors to the DNA found on the bag of heroin. Tr. Vol. IV at p. 770. However, the State's expert was not able to exclude Carr. *Id.* As an additional point, the evidence was not disclosed during trial; it was disclosed before trial, although not timely. Nonetheless, there was simply no evidence that the State acted willfully or in a calculated manner. To the contrary, all parties agreed that the fault was of the crime lab, not the prosecutors. Even if these facts were otherwise, the trial court properly followed the procedures in Crim.R.

16(E)(3) [now Crim.R. 16(L)(1)][6] and allowed Carr's counsel to properly prepare for cross-examination.

{¶ 75} On March 20, 2020 (and after this case was submitted), the Supreme Court of Ohio issued a decision concerning Crim.R. 16(K). *See State v. Boaston*, Ohio Slip Opinion No. 2020-Ohio-1061, __ N.E.3d __. The issue in *Boaston* involved admission of expert opinions at trial that were not previously disclosed in the expert's report. The opinion related to the time of the victim's death and the expert's match of a buckle on the defendant's glove to a mark on the victim's neck. *Id.* at ¶ 1, 35-36, and 39-41.

{¶ 76} Crim.R. 16(K) provides that:

An expert witness for either side shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications. The written report and summary of qualifications shall be subject to disclosure under this rule no later than twenty-one days prior to trial, which period may be modified by the court for good cause shown, which does not prejudice any other party. Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial.

{¶ 77} After reviewing the issue, the Supreme Court of Ohio held that the trial court erred in admitting the testimony. Although defense counsel had met with the expert 19 days before trial and had learned of the expert's additional opinion, the court concluded

---

[6] Under the 2010 revisions to Crim.R. 16, "Crim.R. 16(L)(1) is identical to former Crim.R. 16(E)(3) in detailing a trial court's authority to issue orders in the wake of a party's failure to comply with discovery obligations * * *." *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 33.

this was insufficient.   In this regard, the court stated that:

> The plain language of Crim.R. 16(K) expressly provides the consequence for failing to disclose an expert's report as required: "Failure to disclose the written report to opposing counsel *shall preclude* the expert's testimony at trial." (Emphasis added.)   Crim.R. 16(L)(1) implicitly acknowledges this remedy: "The trial court may make orders regulating discovery *not inconsistent with this rule*." (Emphasis added.)   And while Crim.R. 16(K) confers some measure of discretion on trial judges, it is limited to modifying the 21-day requirement "for good cause shown, which does not prejudice any other party."

(Emphasis sic.)   *Boaston*, Ohio Slip Opinion No. 2020-Ohio-1061, __ N.E.3d __, at ¶ 55.

{¶ 78} The court went on to note that "[t]he significance of the time-of-death opinion based on the stomach-content findings is important because it puts Brandi's time of death during a period when Boaston admitted to having been alone with Brandi at his residence. Additionally, the glove-buckle comparison provided an explanation for what may have caused the distinct chin abrasion likely inflicted during Brandi's struggle or her strangulation."   *Id.* at ¶ 56.   Based on the clear meaning of Crim.R. 16(K), the court held that trial courts do not have discretion in this regard, other than to allow modification of the 21-day rule.   *Id.* at ¶ 55.   The court also observed that the State "could have cured any noncompliance with the rule without prejudicing Boaston's right to a fair trial" by producing a supplemental report.   *Id.* at ¶ 49.   However, the State had declined to do so, even after the defense had suggested before trial that the State provide one.   *Id.* at ¶ 40.   Nonetheless, this was not the basis of the court's holding; rather, the basis was a

strict application of the language in Crim.R. 16(K).  *Id.* at ¶ 53-54.

**{¶ 79}** Here, in arguing that the State should be sanctioned for failing to timely disclose Submission 015, Carr did not rely on Crim.R. 16(K); instead, he relied on *Brady* and on case law discussing sanctions under Crim.R. 16(E)(3) [now Crim.R. 16(L)(1)] for failure to provide discovery.  Appellant's Brief at p. 13, citing *City of Lakewood v. Papadelis*, 32 Ohio St.3d 1, 511 N.E.2d 1138 (1987), and *Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971.  In such circumstances, courts consider "the extent to which the prosecution will be surprised or prejudiced by the witness' testimony, the impact of witness preclusion on the evidence at trial and the outcome of the case, whether violation of the discovery rules was willful or in bad faith, and the effectiveness of less severe sanctions."  *Papadelis* at 5.

**{¶ 80}** In *Boaston*, the Supreme Court of Ohio stressed that Crim.R. 16(L)(1) does not give trial courts discretion (other than modification of the 21-day notice rule) in situations involving Crim.R. 16(K), because the latter rule provides its own remedy, which is exclusion of the expert's opinion on the evidence that was not disclosed.  *Boaston*, at ¶ 53-54.  The fact that the defense actually had notice of the opinions was irrelevant.

**{¶ 81}** In the case before us, the situation differs from *Boaston*, as the State did not fail to disclose the evidence.  In fact, the State was as unaware as the defense of the failure to disclose Submission 015.  Furthermore, unlike *Boaston*, the trial court did not admit this evidence at trial without the defense having had access to the information or having had an opportunity to share the information with its own expert.  We also note that the defense chose not to have its expert testify at trial, even though it had an opportunity to do so.  Under the circumstances, we conclude that *Boaston* does not

preclude admission of the evidence and that no error occurred in admitting testimony about Submission 015.

{¶ 82} Assuming for purposes of argument that *Boaston* applies, the Supreme Court of Ohio went on to conduct a harmless error evaluation pursuant to Crim.R. 52(A). In this regard, the court stated that:

> First, it must be determined whether the defendant was prejudiced by the error, i.e., whether the error had an impact on the verdict. * * * Second, it must be determined whether the error was not harmless beyond a reasonable doubt. * * * Lastly, once the prejudicial evidence is excised, the remaining evidence is weighed to determine whether it establishes the defendant's guilt beyond a reasonable doubt.

*Boaston* at ¶ 63, quoting *State v. Harris*, 142 Ohio St.3d 211, 2015-Ohio-166, 28 N.E.3d 1256, ¶ 37.

{¶ 83} After reviewing the evidence without the identification of Carr's DNA on the bag of heroin, we conclude that the error did not impact the verdict and that the error was harmless beyond a reasonable doubt. Further, if the DNA evidence is excised, the remaining evidence establishes Carr's guilt of heroin possession beyond a reasonable doubt. First, more than one witness indicated that they obtained drugs from and sold drugs for Carr, and Carr even admitted that he had been engaged in the drug trade in the past. While Carr claimed he had stopped before this incident, his testimony was not credible. Carr also did not want others to know where he lived, presumably because he had been robbed before. In view of these facts, a logical inference is that Carr would keep drugs away from his home premises.

{¶ 84} Burdette claimed he had no access to the safe, and no evidence was presented otherwise. Tr. Vol. II at p. 363-364. The safe was found on premises that Terry Brachette rented, and Brachette admittedly had keys to the safe. Brachette testified, however, that the heroin belonged to Carr, and that Carr had asked him to put it in the safe. Brachette had been friends with Carr since third grade. *Id.* at p. 388-389. There was also no evidence that Brachette, himself, was involved in selling drugs.

{¶ 85} In his testimony, Brachette stated that Burdette sold drugs for Carr and had been robbed in the past. When that occurred, Carr gave Burdettte more drugs and Burdette would have to work it off. *Id.* at p. 403-404. Brachette also testified (without objection) that he gave detectives a DNA sample, and his DNA was not on the heroin. *Id.* at p. 409. Additionally, Brachette was found not guilty of any charges connected to the heroin. *Id.* at p. 392 and 409-410.

{¶ 86} Finally, a witness (Robbie Turner), who had bunked with Carr in jail, also testified that Carr was angry with Terry Brachette "because he [Terry] left the heroin in the safe with some identification that was along in the safe, that he had let Terry use the house, take over the rent or something for the house or something and he was mad at Terry because he left his [Carr's] identification in the safe with the heroin." *Id.* at p. 597. In view of the above overwhelming evidence, any error in admitting the DNA evidence was harmless.

{¶ 87} Carr's final claim is that he should have been entitled to submit the DNA evidence to multiple experts. However, defense counsel requested and received permission to spend up to $1,500 for a DNA expert. *See* Order Granting Motion for Approval of Fees for DNA Analysis (July 10, 2017).

{¶ 88} "In *Ake v. Oklahoma* (1985), 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53, the United States Supreme Court acknowledged that due process and fundamental fairness require the state to provide an indigent criminal defendant with 'access to the raw materials integral to the building of an effective defense.' " *State v. Brady*, 119 Ohio St.3d 375, 2008-Ohio-4493, 894 N.E.2d 671, ¶ 21, quoting *Ake* at 77. "The decision to grant or deny a defendant's request for an expert witness lies in the trial court's sound discretion." *Id.* at ¶ 23.

{¶ 89} Here, there is no decision to review, because the trial court did grant Carr's request for funds for an expert, and Carr never asked for a second expert. Accordingly, Carr's contention is without merit.

{¶ 90} Based on the preceding discussion, we find no error with respect to the disclosure of the DNA evidence. Thus, since we have rejected all issues raised by Carr, the sole assignment of error is overruled.

{¶ 91} As a final matter, Carr's brief does not mention any issues with respect to the trial court's nunc pro tunc order of July 12, 2018. Crim.R. 36(A) allows courts to correct clerical mistakes in orders at any time, where those mistakes arise from oversight or omission. "The purpose of nunc pro tunc orders * * * is to officially record actions that were actually taken, but not duly recorded." *State v. Arnold*, 189 Ohio App.3d 238, 2009-Ohio-3636, 938 N.E.2d 45, ¶ 56 (2d. Dist.). They are not properly used to reflect "what the court might or should have decided or what the court intended to decide." *State ex rel. Fogle v. Steiner*, 74 Ohio St.3d 158, 164, 656 N.E.2d 1288 (1995).

{¶ 92} In the case before us, the nunc pro tunc order did not change anything that the trial court stated in its prior order. Instead, it simply reflected what the trial court had

done, including its ruling during trial.

{¶ 93} The issue does arise whether we have jurisdiction to hear the post-judgment appeal in Case No. 28080. In *State v. Ritchie,* we held that a nunc pro tunc order changing a dismissal with prejudice to a dismissal without prejudice was a final appealable order under R.C. 2505.02(B)(3) because "it had the effect of vacating a judgment." *State v. Ritchie*, 2d Dist. Montgomery No. 24088, 2011-Ohio-2566, ¶ 9. That is not the case here. The trial court's nunc pro tunc order was not a final appealable order because it does not fit within the categories in R.C. 2505.02.

{¶ 94} As noted, the trial court orally overruled the motion to dismiss the indictment at the conclusion of a hearing on January 22, 2018, but did not file an order. When Carr filed a motion for reconsideration shortly before trial, the court said it would evaluate the matter again after Detective Phillips's testimony. After Phillips testified and Carr rested, the court stated that it saw no reason to reconsider or change its prior decision. The court then filed an order on February 6, 2018, overruling the motion to dismiss the indictment. The judgment entry of conviction was filed on March 18, 2018, and in the normal course of events, the propriety of denial of the motion to dismiss would have been considered in the appeal of the judgment, as it was an interlocutory order.

{¶ 95} However, the trial court neglected to state in its order that the motion for reconsideration of the motion to dismiss was also denied. Following Carr's post-judgment motion, the trial court corrected its prior order, nunc pro tunc, to reflect this point. Nothing was changed, and the order merely reflected the trial court's intent, as expressed previously during trial. Accordingly, the June 12, 2018 order was not a final appealable order, and we lack jurisdiction over the appeal in Case No. 28080. That appeal,

therefore, must be dismissed. We also note that Carr has not given us any reason to believe that the June 12, 2018 order was a final order; in fact, he has not addressed this issue.

## V. Conclusion

**{¶ 96}** Carr's sole assignment of error having been overruled, the judgment of the trial court in Case No. 27960 is affirmed. Because the order being appealed in Case No. 28080 is not from a final appealable order, that appeal is dismissed.

. . . . . . . . . . . . .

TUCKER, P.J. and HALL, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Michael P. Allen
Brian A. Muenchenbach
Hon. Steven K. Dankof