[Cite as *State v. Hartley*, 2023-Ohio-158.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 29510 |
| | : | |
| v. | : | Trial Court Case No. 20CRB00148 |
| | : | |
| AARON P. HARTLEY | : | (Criminal Appeal from Municipal Court) |
| | : | |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on January 20, 2023

. . . . . . . . . . .

JOHN D. EVERETT, Attorney for Appellee

ALAN J. STATMAN and GRANT WENSTRUP, Attorneys for Appellant

. . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} Defendant-appellant, Aaron P. Hartley, appeals from his conviction for assault following a jury trial in the Kettering Municipal Court. In support of his appeal, Hartley claims that the State engaged in prosecutorial misconduct by: (1) making inappropriate comments regarding the reasonable doubt standard of proof during voir

dire; and (2) failing to produce certain evidence that was favorable to the defense. Hartley additionally claims that his trial counsel provided ineffective assistance during voir dire by failing to: (1) effectively challenge certain jurors; and (2) object to the State's inappropriate comments on reasonable doubt.   Hartley further claims that the trial court erred by denying two of his trial counsel's challenges for cause during voir dire.   Lastly, Hartley claims that his assault conviction was against the manifest weight of the evidence. For the reasons outlined below, we disagree with Hartley's claims and will affirm the judgment of the trial court.

**Facts and Course of Proceedings**

{¶ 2} On January 28, 2020, Hartley was charged by complaint with one count of assault in violation of R.C. 2903.13(A), a misdemeanor of the first degree.   The charge stemmed from allegations that Hartley struck the victim, L.J., in the face during a physical altercation after L.J. resisted sexual advances from Hartley.   Hartley pled not guilty to the charge and the matter proceeded to a two-day jury trial beginning on July 28, 2021.

{¶ 3} At trial, the State presented testimony from several witnesses, including L.J. L.J. testified that after she got off work on the evening of Friday January 24, 2020, she noticed that she had missed a telephone call from Hartley.   L.J. explained that Hartley was an attorney who had previously represented her adult son in a criminal matter. When L.J. saw that Hartley had called her, she thought that her son might have been in trouble.   L.J. testified that she returned Hartley's missed call with a text message asking: "Did you call?" and that Hartley responded: "[Y]es."   Trial Tr. Vol. I (July 28, 2021), p.

144.

{¶ 4} L.J. testified that, over the next few hours, she and Hartley talked on the telephone and exchanged several text messages. The State presented photographs of the text messages at trial, and they were admitted into evidence as State's Exhibits B through E. While talking and text messaging with Hartley, L.J. learned that Hartley was upset because he thought that his wife had been cheating on him. L.J. testified that Hartley sounded inebriated on the phone and that she was concerned about him drinking and driving or possibly hurting himself. L.J. was especially concerned about Hartley's well-being because she knew that Hartley was the father of two little girls.

{¶ 5} L.J. testified that Hartley expressed his need for a friend and kept insisting that she come over to his residence. L.J. testified that she refused to go to Hartley's residence but told Hartley that he could come over to her house to talk. Since Hartley professed having marital problems, L.J. testified that she also invited Hartley to spend the night at her house so that he could have a safe place to stay. L.J. claimed, however, that she made it very clear to Hartley that she was inviting him over as a friend and not for purposes of sex. L.J. testified that she told Hartley that he could sleep in her bedroom and that she would sleep in her 13-year-old daughter's bedroom.

{¶ 6} Later that night, L.J. received a call from a stranger who was with Hartley at a local dining and shopping center. L.J. testified that the stranger told her that Hartley was very intoxicated. As a result, L.J. text messaged her address to the stranger in hopes that the stranger would drop Hartley off at her residence. L.J. testified, however, that Hartley eventually drove himself to her residence and arrived around 11 p.m. L.J.

recalled that Hartley was visibly intoxicated when he arrived. Specifically, L.J. noticed that Hartley's speech was slurred and that he could not focus on a conversation.

{¶ 7} Shortly after Hartley arrived at L.J.'s residence, L.J.'s 13-year-old daughter, E.T., came downstairs from her bedroom. L.J. testified that E.T. had previously met Hartley when she was six or seven years old. L.J. testified that she told E.T. that Hartley was not feeling well and that he needed a friend. After explaining why Hartley was there, L.J. testified that E.T. went back upstairs to her bedroom.

{¶ 8} L.J. then testified that she and Hartley started talking about Hartley's wife's cheating on him. Despite Hartley's intoxication, L.J. admitted to giving Hartley a glass of wine, as she thought it would calm him down and make him go to sleep. However, L.J. testified that as she and Hartley were talking, Hartley would be calm and then suddenly get agitated. While they were sitting on the living room couch, L.J. testified that Hartley began to say inappropriate things about E.T. L.J. specifically recalled Hartley's saying that E.T. was only 13 and had a "tight ass." Trial Tr. Vol. I at 156.

{¶ 9} Despite Hartley's inappropriate comments, L.J. tried to get Hartley to go to sleep in her bedroom, which was located on the first floor of her residence. L.J. testified that when they got to her bedroom, Hartley would lie down and then jump up and become erratic. L.J. also testified that Hartley said he wanted to have anal sex with her, and she told him that was not going to happen. Thereafter, L.J. testified that Hartley acted like he was going to sleep and then suddenly sat up. L.J. testified that after Hartley sat up, he spontaneously took a sip of wine and then threw his wine glass at her bathroom door causing wine and glass to go everywhere.

{¶ 10} L.J. testified that, after Hartley threw the glass of wine, he told her that he wanted to "fuck [her] daughter in the ass" and then immediately ran upstairs toward E.T.'s bedroom. L.J. ran after Hartley, but when she and Hartley got to E.T.'s bedroom, they discovered that E.T. was gone. Upon realizing that E.T. was missing, L.J. testified that she panicked and told Hartley to call 9-1-1. Shortly after calling 9-1-1, L.J. received a text message from E.T. stating that she was at her father's house. As a result, L.J. told the police officer who responded to her 9-1-1 call that everything was okay.

{¶ 11} Officer Jared Rhoten of the Centerville Police Department was the officer who responded to the 9-1-1 call. Rhoten testified that he was dispatched to L.J.'s residence at 1:25 a.m. on the complaint of a missing juvenile. Rhoten testified that when he arrived at the residence, he quickly learned that the missing juvenile was safe. As a result, Rhoten did not search L.J.'s residence but merely spoke with L.J. inside of her front doorway. While doing so, Rhoten did not notice anyone inside the residence other than L.J. Although Rhoten testified that L.J. appeared to be frazzled, he noticed no physical injuries to her person; Rhoten spoke with L.J. for approximately 10 minutes, and L.J. never mentioned Hartley's being there or any issue with Hartley's making sexual comments about her daughter. Because L.J.'s daughter was reported safe, Rhoten thereafter left the residence.

{¶ 12} E.T. testified that she left her mother's residence because of Hartley. E.T. testified that while she was downstairs getting some food from the kitchen, she overheard Hartley making comments about her body while he was in her mother's bedroom. Specifically, E.T. heard Hartley say "wow [she is] only 13 and [she] must have a tight ass"

and that he's "going to run up to [her] room." Trial Tr. Vol. II at 334. E.T. testified that after hearing Hartley's comments, she called her father to pick her up because she was afraid of Hartley. E.T. testified that she did not tell her mother that she was leaving because her mother was in the same room with Hartley.

{¶ 13} L.J. testified that after Ofc. Rhoten left her residence, Hartley began to get more aggressive with her. As a result, L.J. told Hartley to leave her house and ran into her bedroom to get away from him. L.J. testified that Hartley kicked her bedroom door and barged into her bedroom. L.J. also testified that as Hartley was barging into her bedroom, he hit her in the face with a closed fist by reaching his left arm through her partially-opened bedroom door.

{¶ 14} Continuing, L.J. testified that once Hartley was in her bedroom, he tried to take her cell phone from her while she was attempting to call 9-1-1; a physical struggle ensued during which Hartley unintentionally pulled her hair and caused her to fall on the bed. After falling on the bed, L.J. testified that she grabbed her cell phone and ran into a closet in her bathroom. L.J. stated that she leaned her body against the closet door to prevent Hartley from getting inside. L.J. testified that Hartley punched the wall with his fist while she was in the closet calling 9-1-1.

{¶ 15} The State played an audio recording of L.J.'s second 9-1-1 call at trial, and it was admitted into evidence as State's Exhibit V. During the call, L.J. told the operator that she was trying to get Hartley out of her house and that he was being very violent with her. L.J. explained to the operator that she had locked herself in her closet and that Hartley refused to leave her residence. On the audio recording, L.J. can be heard telling

Hartley multiple times to "please leave" and Hartley's randomly yelling in the background. L.J. can also be heard telling the operator that Hartley hit her "multiple times."

{¶ 16} While testifying, L.J. clarified that Hartley actually hit her only once during the altercation. In an effort to explain the variance in what she reported during the 9-1-1 call, L.J. testified that at the time of the call, she was simply trying her best to relay information to the operator. L.J. claimed that when she told the operator that Hartley had hit her "multiple times" she was actually referring to everything else that had happened, i.e., Hartley kicking her bedroom door, hitting her in the face, trying to get her phone out of her hands, pushing her, pulling her hair, and punching the wall.

{¶ 17} As a result of the second 9-1-1 call, Ofc. Rhoten testified that he was once again dispatched to L.J.'s residence, this time at 3:25 a.m. on the complaint of a disorderly male. Rhoten testified that when he arrived at L.J.'s residence, he did not hear any sounds of distress or physical assault. As a result, he simply knocked on the door and waited until L.J. answered. Rhoten testified that when L.J. answered the door, she was very upset and disheveled. Rhoten observed that L.J. was crying and that she had a mark underneath her eye that had not been there when he saw her a few hours earlier. When Rhoten asked L.J. about the injury, L.J. told him that it was not from the reported altercation with Hartley.

{¶ 18} Ofc. Rhoten testified that he and his fellow officer, Ofc. Beane, entered L.J.'s residence and separated L.J. and Hartley into different rooms. While inside the residence, Rhoten observed that Hartley was extremely intoxicated, as he noticed that Hartley had slurred speech, was stumbling, and smelled of alcohol. Rhoten also recalled

Hartley's being very loud and saying a lot of "incoherent nonsense." Trial Tr. Vol. II at 289. Rhoten testified that Hartley screamed about his wife and called her several expletives. Rhoten also testified that Hartley was very agitated and walked aggressively toward him as he continually instructed Hartley to sit down.

{¶ 19} In addition, Ofc. Rhoten testified that he looked around the first floor of L.J.'s residence and observed a large crack on the right side of L.J.'s bedroom door. Rhoten also observed that the bedroom itself was disheveled and that there was splatter on the bathroom door, but no broken glass. Rhoten further observed large indentations on a wall of the bedroom. Rhoten testified that L.J. told him that the observed damage had happened during the altercation with Hartley, but that L.J. never specifically stated who caused the damage. Rhoten explained that when he spoke with L.J. about the altercation, L.J. did not go into any specific details; L.J. simply told him that she and Hartley had gotten into a physical altercation during which Hartley had thrown a wine glass, broken her door, and pulled her hair. When Rhoten spoke with Hartley, Hartley said "nothing happened." Trial Tr. Vol. II at 292.

{¶ 20} Because he observed an injury on L.J. that was not there earlier, Ofc. Rhoten asked L.J. multiple times if she wanted to pursue criminal charges against Hartley. According to Rhoten, L.J. did not want to pursue any kind of charges and simply wanted to have Hartley removed from her residence so that she could go to sleep. As a result, Rhoten did not arrest Hartley; instead, he contacted one of Hartley's friends to pick him up and take him home. Once Hartley was gone, Rhoten testified that he left L.J.'s residence and had nothing more to do with the matter.

{¶ 21} L.J. testified that she did not tell Ofc. Rhoten that the mark under her eye was from Hartley's hitting her because she did not want to get Hartley in trouble and because she wanted everyone to leave. Although L.J. confirmed that she initially did not want to pursue any criminal charges against Hartley, she testified that after speaking with her daughter and seeing the damage that Hartley had caused, she changed her mind and contacted the police later on the morning of the altercation.

{¶ 22} After L.J. contacted the police department, Officer James Stephenson came to her residence and took pictures of her injury and the damage to her home. Stephenson's photographs were admitted into evidence as State's Exhibits G through S. The photographs show wine splattered on L.J.'s bathroom door, indentations on L.J.'s wall, a large crack in L.J.'s bedroom door, and an abrasion underneath L.J.'s left eye. L.J. testified that after Stephenson took the aforementioned photographs, she went to the police department and wrote a statement about what had happened between her and Hartley.

{¶ 23} Continuing, L.J. testified that she later realized that she had incorrectly told Ofc. Stephenson that Hartley had hit her with his right hand as opposed to his left. In an attempt to correct the mistake, L.J. e-mailed Stephenson to notify him of the error. At the time of trial, the State did not know about L.J.'s e-mail to Stephenson and therefore had not provided it to the defense in discovery. During a short recess, L.J. forwarded a copy of the e-mail to the State, and the State provided the e-mail to the defense. Despite the delayed disclosure, the defense declined to move for a mistrial and had the e-mail admitted into evidence as Defendant's Exhibit 1.

{¶ 24} Ofc. Stephenson also testified at trial and confirmed that he had met with L.J. on the morning of January 25, 2020, to discuss the altercation with Hartley. Stephenson testified to observing a red mark and swelling underneath L.J.'s left eye and to taking photographs of the injury and the damage to L.J.'s home. Stephenson also testified to reviewing L.J.'s text messages and phone records, and he noted that Hartley had initiated contact with L.J. on the night in question. Stephenson further testified that L.J.'s phone records confirmed that the first 9-1-1 call was not made from L.J.'s cell phone.

{¶ 25} In addition, Ofc. Stephenson testified that L.J. had expressed a desire to pursue criminal charges against Harley and confirmed that L.J. had signed an affidavit of charges against him. Stephenson testified that after the affidavit of charges was signed, he spoke with Hartley and informed Hartley that he was being charged with assaulting L.J. Stephenson also spoke with E.T. and E.T.'s father and testified that E.T. told him that she had heard Hartley make comments about her, which E.T. was uncomfortable discussing.

{¶ 26} On cross-examination, Ofc. Stephenson testified that L.J. had told him that Hartley had said that E.T. had a "tight ass" and that he wanted to go upstairs to E.T.'s bedroom. Stephenson testified, however, that L.J. had not mentioned anything about Hartley's saying that he wanted to have anal sex with E.T. In addition, Stephenson confirmed that L.J. had initially reported that Hartley had hit her with this right hand and that he had intentionally grabbed her hair.

{¶ 27} After the State rested its case, the defense called Celia Plyman, the

operator who responded to both of the 9-1-1 calls in question. Plyman testified that the Centerville Police Department no longer had the recording of the first 9-1-1 call during which E.T. was reported missing. Trial Tr. Vol. II at 359. Plyman also testified that during the first 9-1-1 call, there was no report of anyone making inappropriate sexual threats or comments with regards to E.T. Plyman further testified that she spoke with L.J. during the first 9-1-1 call and that it was possible L.J. had made the call from another person's cell phone.

{¶ 28} After all the testimony and evidence was presented at trial, the jury deliberated and found Hartley guilty of assault. At sentencing, the trial court ordered Hartley to serve 180 days in jail with 170 days suspended and three years of supervised probation. The trial court also ordered Hartley to pay a $1,000 fine with $850 suspended, $2,000 in restitution to L.J., and court costs.

{¶ 29} Hartley now appeals from his conviction and raises four assignments of error for our review.

## First Assignment of Error

{¶ 30} Under his first assignment of error, Hartley contends that the State engaged in prosecutorial misconduct by: (1) making improper statements regarding the reasonable doubt burden of proof during voir dire; and (2) failing to produce evidence favorable to the defense in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

*Standard of Review*

{¶ 31} " 'The test for prosecutorial misconduct is whether remarks [or prosecutors' actions] were improper and, if so, whether they prejudicially affected substantial rights of the accused.' " *State v. Carr*, 2d Dist. Montgomery Nos. 27960 and 28080, 2020-Ohio-1523, ¶ 60, quoting *State v. Jones*, 90 Ohio St.3d 403, 420, 739 N.E.2d 300 (2000), citing *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). "The touchstone of the analysis 'is the fairness of the trial, not the culpability of the prosecutor.' " *State v. Garrett*, Ohio Slip Opinion No. 2022-Ohio-4218, __ N.E.3d __, ¶ 144, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). "Where it is clear beyond a reasonable doubt that a jury would have found the defendant guilty even absent the alleged misconduct, the defendant has not been prejudiced, and his conviction will not be reversed." *State v. Stevenson*, 2d Dist. Greene No. 2007-CA-51, 2008-Ohio-2900, ¶ 42, citing *State v. Loza*, 71 Ohio St.3d 61, 78, 641 N.E.2d 1082 (1994).

{¶ 32} "If a defendant failed to object to the alleged misconduct below, however, we review the claim for plain error. To prevail on plain-error review, [the defendant] must establish both that misconduct occurred and that but for the misconduct, the outcome of the trial clearly would have been otherwise." (Citations omitted.) *State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 111. Notice of plain error "is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

*Statements During Voir Dire*

{¶ 33} For his first prosecutorial misconduct claim, Hartley asserts that the State made inappropriate statements during voir dire while explaining the reasonable doubt burden of proof to the jury. We note that there is no dispute that the State correctly explained that proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of the person's affairs. *See* Ohio Jury Instructions CR 405.07. Hartley, however, takes issue with the State's thereafter citing marriage and buying a house as examples of decisions that are made using reasonable doubt. Specifically, Hartley is troubled by the State's suggestion that such decisions are made without knowing everything about the spouse or house in question and then likening that to reasonable doubt. Hartley claims that using such analogies denigrated the meaning of "reasonable doubt," which misled the jury and prejudiced him at trial. We disagree.

{¶ 34} As a preliminary matter, we note that Hartley never objected to the analogies at issue and therefore waived all but plain error for appeal. Accordingly, Hartley must establish that the outcome of his trial would have been different but for the State's use of the analogies in question.

{¶ 35} This court has previously stated that: " '[W]e look with disfavor on attorneys' or judges' uses of examples to illustrate their own subjective conception of reasonable doubt.' " *State v. Renner*, 2d Dist. Montgomery No. 25514, 2013-Ohio-5463, ¶ 50, quoting *State v. Turic*, 2d Dist. Greene No. 2010-CA-35, 2011-Ohio-3869, ¶ 13. We

further explained that the Ohio Revised Code defines reasonable doubt in R.C. 2901.05(E) and that "[f]urther attempts to 'clarify' the term by example, analogy, metaphor, or simile are ill-advised." *Id.*, quoting *Turic* at ¶ 13.

{¶ 36} Similar to this case, the prosecutor in *Renner*, gave a correct definition of reasonable doubt during voir dire, but then elaborated on the definition using an analogy. *Renner* at ¶ 49-51. To illustrate that the reasonable doubt standard of proof does not require an absence of all doubt, the prosecutor in *Renner* gave an example of four witnesses viewing a car crash with different versions of what happened, but all agreeing that a crash had occurred. *Id.* at ¶ 49. Although this court frowned on the prosecutor's use of the analogy, no reversible error was found because the prosecutor's comments did not "unfairly mislead the jury." *Id.* at ¶ 51. This court reached that conclusion because "the trial court instructed the jury following voir dire that the court would set forth the law to be applied to the case, and the court correctly defined reasonable doubt in the jury instructions prior to deliberations." *Id.* *See also Garrett*, Ohio Slip Opinion No. 2022-Ohio-4218, __ N.E.3d __, at ¶ 146 (finding no plain error because any misstatements made during voir dire were cured by the trial court's jury instructions); *State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, ¶ 79 (holding that while the prosecutor's analogy during voir dire was perhaps inappropriate, it did not denigrate the reasonable doubt standard and the trial court's reasonable-doubt instructions negated any misconception by the jury).

{¶ 37} Although this court advises against using analogies like the ones used by the State in this case, we cannot say that the analogies unfairly misled the jury. Any

possible misconception the analogies may have caused was cured by the trial court's subsequent jury instructions, which accurately defined reasonable doubt. *See* Trial Tr. Vol. II at 437-438. Accordingly, Hartley was not prejudicially affected by the State's analogies and therefore cannot establish a claim of prosecutorial misconduct or plain error.

*Failure to Produce Favorable Evidence*

**{¶ 38}** Hartley also claims that the State engaged in prosecutorial misconduct by failing to produce certain evidence that was favorable to the defense. The first piece of evidence in question was the e-mail that L.J. sent to Ofc. Stephenson regarding Hartley's hitting her with his left hand as opposed to his right. As previously discussed, L.J. testified regarding the e-mail and claimed that she had provided it to the State. The State, however, advised the trial court that it had not known about the e-mail. Thereafter, a recess was taken and L.J. forwarded the e-mail evidence to the State during trial. The State then immediately provided the e-mail to the defense. The defense then advised the trial court that, although it believed the evidence should have been disclosed in discovery, the defense was not going to move for a mistrial. Instead, the defense chose to have the e-mail admitted into evidence as Defendant's Exhibit 1.

**{¶ 39}** On appeal, Hartley now claims that the State's failure to produce the e-mail evidence prior to trial amounted to prosecutorial misconduct in the form of a *Brady* violation. " '*Brady* imposes on the government an obligation to turn over evidence that is both favorable to the defendant and material to guilt or punishment.' " *Carr*, 2d Dist.

Montgomery Nos. 27960 and 28080, 2020-Ohio-1523, at ¶ 63, quoting *State v. Osie*, 140 Ohio St.3d 131, 2014-Ohio-2966, 16 N.E.3d 588, ¶ 154. "Evidence is material if there is a ' "reasonable probability" ' that the result of the trial would have been different had the evidence been disclosed to the defense.' " *Osie* at ¶ 153, quoting *Kyles v. Whitley*, 514 U.S. 419, 433, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). (Other citation omitted.) " 'Materiality pertains to the issue of guilt or innocence, and not to the defendant's ability to prepare for trial.' " *Id.* at ¶ 154, quoting *United States v. Bencs*, 28 F.3d 555, 560 (6th Cir.1994). (Other citation omitted.) " 'Thus, *Brady* generally does not apply to delayed disclosure of exculpatory information, but only to a complete failure to disclose.' " *Id.* at ¶ 155, quoting *Bencs* at 560. *Accord Carr* at ¶ 63.

{¶ 40} Upon review, we find that *Brady* does not apply to the e-mail evidence at issue, because the State did not completely fail to disclose the e-mail, but provided the e-mail to the defense during its cross-examination of L.J. Because the defense was able to use the e-mail at trial, and because the jury found that Hartley was guilty despite the e-mail's admission, no prejudice arose from the State's delayed disclosure. Accordingly, Hartley's prosecutorial misconduct claim concerning the e-mail evidence lacks merit.

{¶ 41} Hartley also argues that the State committed prosecutorial misconduct via a *Brady* violation by failing to provide the defense with an audio recording of the first 9-1-1 call. Hartley claims that the audio recording would have allowed the jury to hear what, if anything, L.J. said about Hartley at the time he allegedly made sexually inappropriate comments about E.T. Hartley also claims that the recording would have exposed inconsistencies in L.J.'s trial testimony and would have shown L.J.'s general state of

confusion on the night in question.

**{¶ 42}** Upon review, we do not find that the audio recording at issue amounted to material, exculpatory evidence for purposes of a *Brady* violation. The first 9-1-1 call occurred before the assault in question took place and did not directly relate to the assault. While the audio recording may have been potentially useful to the defense, this court has explained that "evidence is not materially exculpatory if it is merely potentially useful." *State v. Ross*, 2012-Ohio-4977, 980 N.E.2d 547, ¶ 12 (2d Dist.).

> Potentially useful evidence indicates that the evidence may or may not have incriminated the defendant. The failure to preserve evidence that by its nature or subject is merely potentially useful violates a defendant's due process rights only if the police or prosecution acted in bad faith. The term "bad faith" generally implies something more than bad judgment or negligence. It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud.

*Id.*, citing *State v. Grigley*, 2d Dist. Montgomery No. 21632, 2007-Ohio-3159.

**{¶ 43}** In this case, the State did not act in bad faith when it failed to provide the defense with the audio recording at issue, as the record indicates that the police department no longer had the 9-1-1 recording available. Therefore, the State did not withhold any evidence with conscious wrongdoing or dishonest purpose. *See State v. Smoot*, 2015-Ohio-2717, 38 N.E.3d 1094, ¶ 50 (2d Dist.) (holding that the State's failure to provide video evidence that was not materially exculpatory was not in bad faith under

circumstances where the video evidence was deleted by the sheriff's office after 45 days pursuant to office policy).   For the foregoing reasons, Hartley's prosecutorial misconduct claim concerning the 9-1-1 audio recording also lacks merit.

{¶ 44} Because all of Hartley's prosecutorial misconduct claims lack merit, his first assignment of error is overruled.

## Second Assignment of Error

{¶ 45} Under his second assignment of error, Hartley claims that his trial counsel provided ineffective assistance during voir dire because counsel did not: (1) effectively challenge certain jurors; and (2) object to the prosecutor's comments regarding the reasonable doubt standard of proof.

*Standard of Review*

{¶ 46} To succeed on an ineffective assistance claim, a defendant must establish: (1) his trial counsel's performance was deficient; and (2) the deficient performance prejudiced him.   *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), paragraph two of the syllabus; *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus.   To establish deficient performance, a defendant must show that his trial counsel's performance fell below an objective standard of reasonable representation.   *Strickland* at 688; *Bradley* at 142.   To establish prejudice, a defendant must show that there is "a reasonable probability that, but for counsel's errors, the proceeding's result would have been different."   *State v. Hale*, 119 Ohio St.3d

118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 204, citing *Strickland* at 687-688 and *Bradley* at paragraph two of the syllabus. The failure to make a showing of either deficient performance or prejudice defeats a claim of ineffective assistance of counsel. *Strickland* at 697.

{¶ 47} In reviewing ineffective assistance claims, " 'we will not second-guess trial strategy decisions, and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." ' " *State v. English*, 2d Dist. Montgomery No. 26337, 2015-Ohio-1665, ¶ 10, quoting *State v. Mason*, 82 Ohio St.3d 144, 157-158, 694 N.E.2d 932 (1998), quoting *Strickland* at 689. Therefore, " 'trial counsel is allowed wide latitude in formulating trial strategy[.]' " *State v. Collins*, 2d Dist. Miami No. 2010-CA-22, 2011-Ohio-4475, ¶ 15, quoting *State v. Olsen*, 2d Dist. Clark No. 2009-CA-110, 2011-Ohio-3420, ¶ 121. "Debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel, even if, in hindsight, it looks as if a better strategy had been available." *State v. Conley*, 2015-Ohio-2553, 43 N.E.3d 775, ¶ 56 (2d Dist.), citing *State v. Cook*, 65 Ohio St.3d 516, 524-525, 605 N.E.2d 70 (1992).

*Failure to Effectively Challenge Jurors*

{¶ 48} Hartley first claims that his trial counsel provided ineffective assistance by failing to effectively challenge certain jurors during voir dire. We disagree.

{¶ 49} The decision to challenge or exclude a juror is typically attributed to trial strategy. *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶ 63-64;

*State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 99. The Supreme Court of Ohio has "consistently declined to 'second-guess trial strategy decisions' or impose 'hindsight views about how current counsel might have voir dired the jury differently.' " *Mundt* at ¶ 63, quoting *Mason* at 157. "Voir dire does not have to be performed in a particular way, nor is counsel required to ask specific questions." *State v. Johnson*, 2016-Ohio-4934, 69 N.E.3d 143, ¶ 30 (1st Dist.), citing *State v. Evans*, 63 Ohio St.3d 231, 247, 586 N.E.2d 1042 (1992).

{¶ 50} The Supreme Court of Ohio explained that:

"Few decisions at trial are as subjective or prone to individual attorney strategy as juror voir dire, where decisions are often made on the basis of intangible factors." *Miller v. Francis* (C.A.6, 2001), 269 F.3d 609, 620. "The selection of a jury is inevitably a call upon experience and intuition. The trial lawyer must draw upon his own insights and empathetic abilities. Written records give us only shadows for measuring the quality of such efforts. * * * [T]he selection process is more an art than a science, and more about people than about rules." *Romero v. Lynaugh* (C.A.5, 1989), 884 F.2d 871, 878. For these reasons, we have recognized that "counsel is in the best position to determine whether any potential juror should be questioned and to what extent." [*State v. Murphy*, 91 Ohio St.3d 516, 539, 747 N.E.2d 765 (2001)].

*Mundt* at ¶ 64.

{¶ 51} In this case, Hartley first takes issue with his trial counsel's failure to

challenge a juror for cause who stated that she was raped and assaulted in 1971 when she was 16 years old. Specifically, Hartley claims that his trial counsel should have recognized that the juror's traumatic past would cause the juror to identify with L.J. and prevent the juror from being fair and impartial at trial.

{¶ 52} We note that there is no per se rule excluding victims of sexual assault from serving as jurors in cases involving sexual assault. *State v. T.L.*, 10th Dist. Franklin No. 19AP-196, 2020-Ohio-3430, ¶ 25. There is also nothing in the record supporting Hartley's claim that the juror's past traumatic experience prevented her from being a fair and impartial juror. During the voir dire questioning, the juror specifically stated that her traumatic experience was "long past" and that it would not affect her ability to be fair and impartial. Trial Tr. Vol. I at 26.

{¶ 53} In addition, counsel's decision not to challenge the juror might have been trial strategy, as the juror indicated that she had been arrested by the Centerville Police Department for a DUI in 1996 and spent some time in jail. Counsel may have thought that the juror's experience with the Centerville Police Department would be beneficial to the defense. As previously discussed, we will not second-guess such strategic decisions on appeal.

{¶ 54} Moreover, "[w]hen a defendant bases an ineffective-assistance claim on an assertion that his counsel allowed the impanelment of a biased juror, the defendant 'must show that the juror was actually biased against him.' " (Emphasis and citations omitted.) *Mundt,* 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, at ¶ 67. *Accord State v. Ward*, 2d Dist. Montgomery No. 26773, 2016-Ohio-5354, ¶ 10. In this case, there is

nothing in the record indicating that the juror was biased against Hartley. Therefore, we find that Hartley failed establish both deficient performance and prejudice with regard to his counsel's failure to challenge the juror.

{¶ 55} Hartley also takes issue with his trial counsel's failing to challenge another juror for cause who initially stated that her ability to be fair and impartial was affected by having an alcoholic brother who assaulted his wife. Trial Tr. Vol. I at 106-107. Upon further questioning, the juror also stated that she was troubled by the fact that Hartley allegedly assaulted L.J. and expressed strong feelings against assault and alcohol consumption. *Id.* at 107-108. Hartley claims that his trial counsel should have challenged the juror for cause given the juror's statements.

{¶ 56} However, Hartley overlooks the fact that, after further questioning, the juror indicated her ability to be impartial. Specifically, Hartley's trial counsel asked the juror: "If you find beyond a reasonable doubt that [Hartley] assaulted [L.J.], then you're going to find him guilty * * * But, if you don't find beyond a reasonable doubt that he assaulted her, then you should find him not guilty. Can you promise me you'll do that, if that's the case?" Trial Tr. Vol. I at 108. To this, the juror responded: "I will. Yes." *Id.* Then counsel stated: "Alright, That's fair and impartial to me. I'm not asking you to disregard the realities of life and the reality of facts[.]" *Id.* The juror also specifically advised the trial court that despite being uncomfortable with making decisions on a "he said/she said" basis, that she would be able to remain impartial at trial. *Id.* at 104-105.

{¶ 57} Because the juror ultimately indicated her ability to be fair and impartial and because the decision to challenge a juror is a matter of trial strategy, we do not find that

Hartley's trial counsel performed deficiently by failing to challenge the juror for cause. The record establishes that the juror made some statements during voir dire that could have led Hartley's trial counsel to believe that the juror's impanelment may have favored the defense. For example, the juror stated that she distrusted a local police department and professed having difficulties with making decisions on a "he/said she said" basis. Counsel may have thought that the juror's attitude was to the defense's advantage since the State's case was primarily based on the victim's version of events. As previously discussed, this court will not second-guess such trial strategy on appeal.

{¶ 58} Hartley next claims that his trial counsel was ineffective for failing to adequately question one of the jurors about his potential biases as a retired police officer. We note that "[c]ourts do not recognize an unavoidable, built-in bias, preventing law enforcement officers from serving on a jury. Instead the inquiry focuses on whether the prosecutive juror, who also happens to be a police officer, will follow the law and the judge's instructions." *State v. Mick*, 6th Dist. Erie No. E-20-23, E-20-24, 2022-Ohio-2378, ¶ 37. Also, as previously discussed, " 'counsel is in the best position to determine whether any potential juror should be questioned and to what extent.' " *Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, at ¶ 64, quoting *Murphy*, 91 Ohio St.3d at 539, 747 N.E.2d 765. Accordingly, counsel's questioning of the retired police officer was a matter of trial strategy, which cannot form the basis of an ineffective assistance claim.

{¶ 59} Hartley further takes issue with his trial counsel's not using preemptory challenges on two jurors who counsel unsuccessfully challenged for cause. The two jurors at issue included the aforementioned retired police officer and a part-time police

dispatcher.

**{¶ 60}** "Decisions on the exercise of peremptory challenges are [also] a part of trial strategy." *State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, ¶ 408, citing *State v. Goodwin*, 84 Ohio St.3d 331, 341, 703 N.E.2d 1251 (1999). "Trial counsel, who observe the jurors firsthand, are in a much better position to determine whether a prospective juror should be peremptorily challenged." *Id.* " ' "[B]ecause the use of peremptory challenges is inherently subjective and intuitive, an appellate record will rarely disclose reversible incompetence in this process." ' " *Mundt* at ¶ 83, quoting *People v. Freeman*, 8 Cal.4th 450, 485, 34 Cal.Rptr.2d 558, 882 P.2d 249 (1994), quoting *People v. Montiel*, 5 Cal.4th 877, 911, 21 Cal.Rptr.2d 705, 855 P.2d 1277 (1993).

**{¶ 61}** In this case, Hartley has failed to establish that his trial counsel performed deficiently by failing to use preemptory challenges on the retired police officer and police dispatcher. The record indicates that those jurors indicated their ability to remain fair and impartial. During questioning, the retired police officer stated that he did not have a relationship with any Centerville police officers and that he had worked for a different police department. Trial Tr. Vol. I at 83. In addition, the retired police officer indicated that he could be fair and impartial at trial despite being assaulted while on duty and despite being a past victim of domestic violence. *Id.* at 18-20.

**{¶ 62}** The police dispatcher also stated that she did not personally know any Centerville police officers. *Id.* at 63. Although the police dispatcher indicated that she felt a loyalty to the police department and victims of crime, she stated that she would "like to think that [she could] be totally fair" and stated that she had "empathy on both sides."

*Id.* at 31. The police dispatcher also agreed that as she heard things unfold, she might get swayed one way or the other, and that, as she does in her job, the best solution is to "weigh both sides." *Id.* at 31-32. Furthermore, neither of the jurors indicated any actual bias against Hartley.

{¶ 63} Because the use of preemptory challenges is a matter of trial strategy, and because Hartley has failed to show that the impanelment of the retired police officer and police dispatcher prejudiced him, his ineffective assistance claim concerning those jurors lacks merit. *See Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, at ¶ 99; *State v. Lindsey*, 87 Ohio St.3d 479, 490, 721 N.E.2d 995 (2000); *State v. Davis*, 62 Ohio St.3d 326, 350, 581 N.E.2d 1362 (1991) (counsel not ineffective by failing to use peremptory challenges when prospective jurors indicate they can set aside their personal views about the death penalty and apply the law to the facts of the case).

*Failure to Object to the State's Reasonable Doubt Comments*

{¶ 64} Hartley also claims that his trial counsel provided ineffective assistance by failing to object to the State's comments/analogies concerning the reasonable doubt standard of proof. However, even if we found that counsel had performed deficiently in that regard, Hartley cannot establish any resulting prejudice for purposes of an ineffective assistance claim. This is because the comments at issue did not affect the outcome of trial since the trial court provided jury instructions that properly explained the reasonable doubt standard of proof to the jury. Accordingly, Hartley's ineffective assistance of counsel claim fails.

{¶ 65} Because all of Hartley's ineffective assistance of counsel claims lack merit, his second assignment of error is overruled.

**Third Assignment of Error**

{¶ 66} Under his third assignment of error, Hartley claims that the trial court erred by denying the challenges for cause that his trial counsel made against the retired police officer and the police dispatcher during voir dire.   We disagree.

{¶ 67} "Under R.C. 2313.17(B)(9) and (D), and R.C. 2945.25(B), a prospective juror may be challenged, among other things, for an inability to 'be * * * fair and impartial' or, similarly, for suspected bias against the prosecution or the defense."   *State v. Quinn*, 2d Dist. Clark No. 2014-CA-44, 2017-Ohio-7000, 95 N.E.3d 664, ¶ 5.   "In deciding whether to exclude a juror for cause, the court must determine whether the prospective juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' "   *State v. White*, 82 Ohio St.3d 16, 20, 693 N.E.2d 772 (1998), quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980).   *Accord State v. Kuck*, 2016-Ohio-8512, 79 N.E.3d 1164, ¶ 53 (2d Dist.).   The fact that a juror expresses doubts about his or her ability to be impartial at trial does not necessarily prevent the trial court from finding that the juror could be fair and impartial.   *See Kuck* at ¶ 56 ("While the prospective juror believed that she would not be able to judge properly, the trial court, through its questions, was able to show that she would do her duty properly.   We think that this conclusion is reasonable.").

{¶ 68} "A trial court has broad discretion in determining a prospective juror's ability

to be impartial." *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 94. Given that the "determination of juror bias necessarily involves a[n] [assessment of] credibility, the basis of which often will not be apparent from an appellate record," a court of appeals must give " 'deference * * * to the trial judge who sees and hears the [challenged] juror.' " *State v. DePew*, 38 Ohio St.3d 275, 280, 528 N.E.2d 542 (1988), quoting *Wainwright v. Witt*, 469 U.S. 412, 426, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). Because the decision whether to disqualify a juror for cause is a discretionary function of the trial court, said decision is not reversible on appeal absent an abuse of discretion. *Quinn* at ¶ 7; *State v. Choice*, 2d Dist. Montgomery No. 25131, 2013-Ohio-2013, ¶ 19. "A trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary." (Citation omitted.) *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 34.

{¶ 69} As previously discussed, Hartley claims that the trial court abused its discretion by denying his trial counsel's challenges for cause against the retired police officer and police dispatcher. Hartley argues that the comments those jurors made during voir dire indicated that they would not be fair and impartial at trial. Specifically, Hartley takes issue with the retired police officer simply stating: "I don't think so" when asked if his status as a retired police officer and past victim of domestic violence would affect his ability to be fair and impartial. Hartley also takes issue with the police dispatcher's asserting her feelings of loyalty to the police and victims of crime and to her expressing doubt about her ability to be impartial. Hartley suggests that an affirmative statement of impartiality was required.

{¶ 70} In support of his argument, Hartley cites *State v. Freshwater*, 11th Dist. Lake No. 2002-L-041, 2004-Ohio-384, wherein the Eleventh District Court of Appeals held that the trial court abused its discretion by failing to excuse a juror for cause. During the voir dire in *Freshwater*, the prospective juror at issue expressed some doubt as to his ability to remain impartial, but eventually stated that he would "try to be impartial." *Id.* at ¶ 21. The Eleventh District found that the juror's words were "hardly the words of a juror confident in his ability to remain detached and able to render an unbiased verdict." *Id.* at ¶ 25. The juror's statement regarding his impartiality, however, was not the sole reason the Eleventh District found an abuse of discretion for failing to excuse the juror for cause. The decision was also based on the fact that the juror was a prosecutor who had a substantial relationship to the appellant's case. *Id.* at ¶ 23. In his capacity as prosecutor, the juror was in the midst of investigating the appellant's brother on a charge that was similar to that for which the appellant was being tried. *Id.* The juror had even talked to the appellant a week before his trial regarding the appellant's ability to assist in another prosecution. *Id.* In addition, the juror's brother was a prosecutor for the city from which the appellant's case emanated. *Id.* at ¶ 24. Based on all these facts, the Eleventh District determined that the trial court had abused its discretion by not excusing the juror for cause. *Id.* at ¶ 25.

{¶ 71} The present case is distinguishable from *Freshwater* because the jurors at issue in this case have no connection to Hartley or the police department that investigated his case. In addition, the retired police officer indicated that he did not think his status as a retired police officer and past victim of domestic violence would affect his ability to

be fair and impartial. Although the police-dispatcher indicated that she felt a loyalty to the police department and victims of crime, she also stated that she would "like to think that [she could] be totally fair" and that she had "empathy on both sides." Trial Tr. Vol. I at 31. The police dispatcher also explained that as she hears things unfold she might get swayed one way or the other, and that, as she does in her job, the best solution is to "weigh both sides." *Id.* at 31-32. Furthermore, neither juror expressed an actual bias against Hartley.

{¶ 72} To the extent that the two jurors expressed any doubt about their ability to be fair and impartial, we find that based on the record herein, the trial court reasonably determined that the jurors could be fair and impartial and did not abuse its discretion in denying the challenges for cause lodged by Hartley's trial counsel.

{¶ 73} Hartley's third assignment of error is overruled.

## Fourth Assignment of Error

{¶ 74} Under his fourth assignment of error, Hartley claims that his conviction for assault was against the manifest weight of the evidence. We disagree.

{¶ 75} "A weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 12. When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine

whether, in resolving conflicts in the evidence, the trier of fact " 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

{¶ 76} "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence." *State v. Adams*, 2d Dist. Greene Nos. 2013-CA-61, 2013-CA-62, 2014-Ohio-3432, ¶ 24, citing *Wilson* at ¶14. "The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). Therefore, this court will not substitute its judgment for that of the trier of fact on the issue of witness credibility "unless it is patently apparent that the trier of fac[t] lost its way in arriving at its verdict." (Citation omitted.) *Wilson* at ¶ 17.

{¶ 77} Hartley claims that his conviction for assault was against the manifest weight of the evidence because the jury failed to adequately weigh L.J.'s credibility. Hartley claims that L.J.'s testimony lacked credibility and was unreliable because it was inconsistent in several respects. For example, Hartley argues that the recording of the second 9-1-1 call established that L.J. told the operator that Hartley had hit her multiple times, but then she testified at trial that Hartley had hit her only once. In addition, Hartley points to the fact that L.J. changed her story about which hand Hartley had hit her with -

his right or his left. Hartley suggests that L.J. had to make this correction because it would have been virtually impossible for him to have hit her with his right fist if he had been reaching through L.J.'s partially opened bedroom door.

{¶ 78} Hartley, however, overlooks the fact that the inconsistencies were addressed by L.J. at trial. L.J. explained that when she told the 9-1-1 operator that she was hit "multiple times" she was simply trying to do her best to explain what had happened while she was in the moment. By saying "multiple times," L.J. explained that she was referring to the totality of the incident, i.e. Hartley kicking her door, hitting her on the face, trying to get her phone out of her hand, grabbing her hair, and punching her wall. We find that a reasonable juror could have found L.J.'s explanation credible.

{¶ 79} L.J. also testified that she attempted to correct the mistake she made regarding which hand Hartley had hit her with by e-mailing Ofc. Stephenson. The record indicates that L.J. e-mailed Stephenson about the mistake on January 27, 2020, just two days after the altercation. The fact that L.J. attempted to correct the mistake early in the case tends to substantiate the veracity of her testimony. Therefore, we cannot say that the jury lost its way in believing L.J.'s testimony regarding the mistake.

{¶ 80} Hartley also takes issue with the fact that L.J. initially reported to Ofc. Stephenson that he had intentionally pulled her hair, but then testified at trial that the hair pulling was unintentional. At trial, however, L.J. explained that Hartley pulled her hair "in the squabble for her phone." Trial Tr. Vol. I at 217. L.J. never stated that the resulting physical altercation was unintentional. Because it is clear from L.J.'s testimony that Hartley intentionally engaged in a physical altercation in an attempt to take her phone, a

reasonable juror could have found that it was immaterial whether Hartley meant to pull L.J.'s hair. In any event, the fact that L.J. testified that the hair pulling was unintentional shows that L.J. was trying to be as honest as possible, as she gained nothing from testifying in that manner.

{¶ 81} Hartley next takes issue with L.J.'s having said nothing to the responding police officers about his alleged sexual statements concerning her 13-year-old daughter, E.T. Hartley argues that if any such statements had been made, L.J. would have reported them to the officers when they first responded to her 9-1-1 calls as opposed to waiting to report it after she decided to pursue criminal charges against him. Hartley also claims that L.J.'s testimony was illogical because it indicated that she was still willing to let him sleep over at her house despite his alleged sexually aggressive behavior toward her daughter. Hartley maintains that if he had engaged in such conduct, L.J. would have had him kicked out of her home when the police responded to the first 9-1-1 call. Hartley also points to inconsistencies in the order of events testified to by L.J. and E.T. and also in E.T.'s testimony regarding where she was at the time she heard the alleged sexual comments.

{¶ 82} Regardless of all the inconsistencies pointed out by Hartley, we do not find that the evidence weighed heavily against finding Hartley guilty of assault, because many of the inconsistencies in question did not specifically touch on the actual assault. Furthermore, this court "afford[s] great deference to the trier of fact's determination of witness credibility." (Citation omitted.) *State v. Davis*, 2d Dist. Champaign No. 2022-CA-08, 2022-Ohio-3758, ¶ 11. "In reaching its verdict, the jury was free to believe all,

part, or none of the testimony of each witness and to draw reasonable inferences from the evidence presented." (Citation omitted.) *State v. Greenlee*, 2d Dist. Montgomery No. 28588, 2020-Ohio-4764, ¶ 21. Even though there were inconsistencies in L.J.'s testimony, we do not find that the jury lost its way in arriving at its verdict, as there was ample evidence demonstrating that Hartley knowingly caused physical harm to L.J. by hitting her in the face. Therefore, we do not find that Hartley's conviction for assault was against the manifest weight of the evidence.

**{¶ 83}** Hartley's fourth assignment of error is overruled.

## Conclusion

**{¶ 84}** Having overruled all four assignments of error raised by Hartley, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

TUCKER, J. and LEWIS, J., concur.